Mr. Castetter, I've been calling on you all morning, finally, here's your time now. Thank you, Your Honor. May it please the Court, my name is Alex Castetter, and I represent Marquita Higgins in her claims against her former employer, Lufkin Industries. Ms. Higgins was subjected to propositions at Lufkin Industries by a man named Lance Redd, who spent some time first as a co-worker of hers and then later became one of the supervisors on her shift. In essence, this case is about whether Lufkin Industries should be held liable for Mr. Redd's attempts to discipline or even terminate Ms. Higgins after she refused to have sex with him. All right. Now, there is nothing in the record that I saw or in the brief that indicated to me whether when he dismissed her to go home on that one occasion that he worked, she worked under him, was for pay or with pay or without pay? I believe that was with pay. There was actually no documentation done on that event. Where is the adverse action in that? Well, Your Honor, basically, it's the effect of the one day him taking the opportunity while he was over her to send her home. That is not a violation of law. That is just evidence that supports the ultimate claim in this case, which is discharge. Is that right? I agree, Your Honor. Yes, it is the discharge. So the question here is whether his inappropriate advances to her, his request for a quid pro quo, and his sending her home have any effect or what effect on her termination. Is that it? Well, that, but of course, Your Honor, he also played a role in that he is the person who told the safety man that he suspected that she was on drugs. He was involved in that day. What role does all of his conduct play in her later termination for refusing to take a drug test and for admitting that she was on prescription drugs, driving a forklift? Is that right? What does all this mean? How does that affect her discharge? She was discharged basically for refusing to take a drug test and for being under the influence of drugs while on the job. That's what she was discharged for. Really, Your Honor, she wasn't discharged for being under the influence of any drugs. She does admit after the fact she was on Vicodin because she was, in fact . . . She admitted she was driving erratically, I thought. She admitted that the forklift had problems, and so it jerked when she tried to drive it, and so it did do some odd things. Both of those two factors are things that she was actually speaking to her supervisor, Banu Thomas, about when both the safety man and Mr. Redd came and told her to take the drug test. She was trying to get her medical leave straightened out, for which the reason that she'd been gone was why she was taking the Vicodin, which she was on a prescription for. She was also telling him about the problems with the forklift when she was driving it and how it had to be charged up on the way, and it still wasn't driving right when she was coming back. What was she terminated for? What was the reason she was terminated? The defendants would say that it was because she refused the drug test. What would you say? I would say it's because she refused the sexual advances of Mr. Redd and the retaliation that ensued from that, both from him and from Mr. Duford after she complained to him and he didn't do anything about it. So in that connection, do you admit that the company had a policy for terminating employees who refused to take a drug test? They did. What we don't admit is that she actually refused. She brought up that she was uncomfortable doing it. One quick question. Did she show any instances in which other persons had refused to take drug tests who had not been terminated? I'm not aware of any, but there are none that are circumstances like hers. The fact is she didn't refuse, Your Honor, and she was told that she could go to the clinic the following morning, 8 a.m. She wasn't told that if she didn't do it that day, she would be terminated. The policy doesn't provide for any time limit, but after her discomfort, she was specifically told to go ahead and go up to the clinic at 8 a.m. the next morning. She did so. She was ready and willing to take the drug test, knowing that Mr. Redd would not be in She was suspended and shortly thereafter terminated. Was she offered to take the drug test at that time? That's specifically what she went up there to do, but I don't believe she said those words because she understood that they knew that's what she was there to do, but no one let her do it at that point. No one let her do it, but she didn't ask for it. That's true. Mr. Duford wasn't there. When she asked what was going on, she waited for about an hour and a half. When she started inquiring about seeing someone and getting her process done, I don't know that she specifically said drug test, but at that point, Mr. Duford was called and she was just simply told that she was suspended, even though she'd been waiting that hour and a half specifically for the purpose of doing a drug test. I read that she was asleep while all that was going on. There was a period of time while she was waiting in that hour and a half time that she nodded off just because she was waiting for someone to tell her they were ready to take the drug test. Well, again, it was her understanding that Mr. Quick had told her to do that, but no, she didn't specifically ask that morning for it. So, there are essentially theories of sexual harassment and retaliation that she's pursuing and that we're here for today. There's two basic issues that I want to address. The first is whether the district court erred in failing to apply the cat's paw theory to her quid pro quo sexual harassment claim, and the second is whether the district court erred in finding, both for sexual harassment and retaliation, that the reasons stated for firing her were pretextual. On those specific points, can you point to any evidence that Red actually used his authority to cause the adverse employment action? Your Honor, Mr. Red is the person who went to the safety man and told him that he suspected that she was on drugs, even though, and they alleged specifically marijuana. Of course, the only thing Ms. Higgins was on was the Vicodin for which she had a prescription. And, of course, in an evidentiary manner, there's the previous dealings on April 5th, the one and only time that he supervised her directly in which he sent her home and took her off of her position. Is there evidence that she was not on marijuana? To my knowledge, Your Honor, certainly she testified that she was not under oath and there's no evidence from any source that she was. With regard to the quid pro quo sexual harassment, the district court specifically found that because Red did not have the authority to take tangible employment action against her on the two occasions when he made remarks, she could not prevail on the quid pro quo theory. The comments took place over a couple periods of time. One was in January of 2012, and it's true, at that point, Mr. Red was a coworker. That's when he made comments about never having been with a black woman, putting his private he was going to lick, lick, lick her from her head to her toe. And when she told him that she was not there for that, he called her pejorative terms referring to both her race and her sex. In March of 2012 is when it became more direct, though, and that's while he was in training to be a supervisor. It was that very month when he took over as a supervisor, and that's when he told her, when he threatened to write her up if she would not have sex with him. Of course, she did not, and in fact, she did go to the union steward, Pat, who took the He was a supervisor when he told her that he would write her up if she did not have sex with him? He was training to be the supervisor, and he was about to take over that position, which he did that same month. So, at that point, they went to David Duford. They spoke to him. He knew about their problems from that time on, and yet, at all of the points thereafter, when Ms. Higgins complained about what was happening to her, he still rubber-stamped those decisions that came from Mr. Redd. Of course, those go back to the April 5, 2012 event, when Duford told her, even though he knew the harassment claim, that no matter what your supervisor asks you to do, you do it. There was a subsequent occasion when Mr. Redd yanked her off the forklift that she was operating, telling her that she wasn't answering her calls, even though Ms. Higgins received no calls that she didn't answer. There was no formal discipline there, but again, it's another evidentiary matter. And then, finally, in June, when she was terminated, while driving the forklift that was not pulling well, and Mr. Quick admits both that he based it on Mr. Redd telling him that he suspected her of using drugs, and admitted that he told her to go to the clinic the next day, even though nothing ever came of that. So given... Mr. Redd was the one that told her to go to the clinic the next day? No, Mr. Quick, the safety man. They both had been talking all along while on the cart, and Mr. Redd was involved in giving information to Mr. Quick, but it is the safety man, Mr. Quick, who told her to go to the clinic. And so it's our contention that not only was Mr. Redd in a position as a supervisor in training to carry out his threats to discipline her, which he in fact did. This all happened in March of 2012, and by June of 2012, even though she'd never been in trouble with her own supervisor, had never been written up for anything previously, once these issues began with Mr. Redd, Ms. Higgins was gone within three months. And even beyond that, Mr. Redd's conduct tainted the decisions of Mr. Duford thereafter. In Staub v. Proctor Hospital, a case under the Uniformed Services Employment and Reemployment Act, the Supreme Court ruled that the discrimination could be imputed where the decision-maker relied on facts provided by the biased supervisor. Similarly, this court, as recently as August, in Zamora v. the City of Houston... Right there. She was terminated, alleged, for refusing to take a drug test. Is that correct? Yes. And Mr. Redd reported that she was driving erratically. Actually, Mr. Redd reported that he suspected she was on drugs. Now, is there any other evidence of a causal connection between her termination, or the reason given for her termination, and Mr. Redd? Just to say the other earlier evidentiary matters that we discussed that reflect on his attitude toward her. Show how he may have influenced Mr. Quigg, whomever finally terminated her. Is there any evidence that he made any recommendation about terminating her, or did anything other than report it, that she may be on marijuana? Well, he did that, and then stayed throughout the meeting with Mr. Quigg, and that's what made Ms. Higgins uncomfortable about going through a drug test at that time. He said nothing in that meeting, or did he say anything in that meeting, that would connect him further with the termination? Basically, he stayed quiet through the meeting. He had spoken to Mr. Quigg on the way. He had also spoken to Mr. Duford back in the April event, where the relief Ms. Higgins got, even while complaining about the harassment, was, when your supervisor says to do something, do it. And so that is the connection that we would point to. Certainly, there was no reason for a drug test to come up at all but for Mr. Redd's involvement in it. So it's our contention that he made good on his threats. He told her that if she wouldn't sleep with him, he would ride her up. He did better than that. He wound up getting her suspended, and ultimately she was terminated all within that three-month period, despite an otherwise good record with Lufkin Industries. Okay. You've certainly saved some time for rebuttal, Mr. Castello. Thank you, Your Honor. May it please the Court, I'm Christopher Bacon, and I represent Lufkin Industries. This case, unlike a lot of employment cases, the reason for the termination of Ms. Higgins really does not contain much of a subjective component. It is undisputed that she refused to take a drug test. It is undisputed that Lufkin's drug policy stated that if you refuse to take a drug test, you would be terminated. Tell us what the evidence is in the record that she refused, because Mr. Castello indicates that the record shows that she showed up the next day at the facility and was there for an hour and a half and ultimately didn't take the test. The evidence in the record is that when the safety steward asked her to take the drug test, she said no. Her union steward was there. Her supervisor was there. I don't mean to cut you off, but was that on the day of the forklift incident, or was that the next day when she? That was what she was told on the day of the forklift accident. She was told, you need to take a drug test. She said, I will not take the drug test. Okay, but then she did show up at the facility the next day where drug tests were provided. Actually, she was told, she was escorted out of the facility and told to report to the safety department the next morning. And that's where drug tests are given? No, actually, drug tests are typically given, they find someone of the same gender, they do the drug test on that day. On the day of the incident? On the day of the incident, absolutely. So on the day of the incident, she was told to take a drug test, and on the day of the incident, she said that she would not do that? That is correct. And the next day, again, correct me if I'm wrong, I'm not trying to put words in your mouth, but the next day, she shows up at the safety facility, but instead of taking a drug test or doing anything else, she's informed that she's terminated? Actually, her testimony is that she contends, and she stated this in her deposition, that she was willing to take a drug test the next day, and she followed the instructions. She said that she went over to the safety department the next day, showed up there, I think her testimony was at 7.30, fell asleep, no one was there apparently, fell asleep, woke up around 10.30, and someone asked her, are you here for an application? And she says, no, I'm here, I think she said that she was here for a drug test, the person didn't know anything about it, and then she called the manager of human resources, and he was not at work at the time, and he said, you know, we'll just have to talk about this later. But that's, you know, she was the one, she says that she would have been willing to take a drug test had one been offered to her the second day. But she was asked the day of the incident to take a drug test, and she refused to take a drug test. And she does not dispute that. And at what point, again, I'm referring only to what's in the record, so at what point was she told that she was terminated for refusal to take a drug test? She was told that about five days later. She was called in for a meeting with her manager, the manager of human resources, her union steward, and the president of the union. And it was during that meeting where she admitted that she actually had been under the influence of Vicodin. She had not admitted that earlier, but she knew she was under the influence of Vicodin at the time. The third thing I wanted to say regarding what is in the evidence, because I think the question was asked is, was there any evidence that Lofkin had not required people to take a drug, not fired people for refusing to take a drug test? There actually was discovery on this issue. Lofkin had administered drug tests quite frequently. There were three instances, including Ms. Higgins, where an employee had refused to take a drug test. The other two were males. There was no evidence that those men had filed complaints of discrimination or complained about harassment. So Lofkin, the evidence that was offered in the record was that they were fired. Lofkin consistently terminated. The policy at Lofkin, and it's changed now because it's been acquired by another company, but at that time was if you took a drug test and you failed the drug test, you were not terminated. You were suspended for 30 days if it was your first positive drug test. If you refused to take a drug test, if you were asked to take a drug test, you were fired. And the evidence is Lofkin was consistent in applying that. Regarding the cat's paw... When she refused to take the drug test, did she say, I refuse to take the drug test as long as Mr. Redd was here? Did she make any reference to him? I do not recall what her testimony was. I believe that that was the essence of her testimony was that she... No, but did anybody else... Was that said at the time, or did she later say that was the reason? I believe her testimony was she said something to that effect, and since this is a summary judgment case, we'll assume that she said that, whether she did or not. Mr. Redd arrived. She did admit that Mr. Redd arrived at the meeting after the fact. What happened was she was talking to her supervisor, Mr. Thomas. The safety man, Alvin Quick, came in. They were addressing another issue. He said, by the way, I want you to take a drug test. And he did that. He did hear from Mr. Redd initially. Mr. Redd actually told him that someone had told him that she was under the influence of drugs. So Mr. Quick, who as part of his job frequently would ask people to take drug tests, said, well, let's go look. And so they drove down to the area where she was working. At that point, she didn't have her safety glasses on. Mr. Quick told her to put her safety glasses on. She got on the forklift that she was driving. Mr. Quick believed, in his opinion, that she was driving erratically, and so that's when he followed her up back to the office, and in the office he told her, you need to take a drug test. After he made that request, Mr. Redd, who at that point was the supervisor, walked into the office, but he was not in the office when the request was first made. He was, however, the person who gave information to Mr. Quick to first go and look at Ms. Higgins and see what she was doing. Your testimony was that when she refused to take the drug test, that Mr. Redd was present at that time? The time frame as to when she actually refused, I think there was an ongoing process because I think they were trying to get her. Her union steward and the supervisor were trying to persuade her to take a drug test. It wasn't just simply, will you take a drug test? She said no. I think there was a series of questions, but she consistently refused, and when it was clear she was not willing to take the drug test, they escorted her out and told her to report to the safety department the next morning. This is also a case that's a retaliation case. It's considered under a but-for standard. So when you consider an argument like a cat's paw argument. Is this solely a retaliation case? It is with respect to the termination. I believe it is a retaliation case. I believe that the plaintiff has also asserted a quid pro quo harassment case based on what Mr. Redd did. When we consider the discharge, we consider it under retaliation analysis. I believe that that's the intention of the complaint, correct? I don't think there's any evidence that, I mean, candidly, I don't believe there's any evidence that she was terminated either in retaliation for having complained about Mr. Redd. This almost has to be a retaliation complaint because she's saying that the reason her termination occurred is because she complained about Mr. Redd. That is correct. And so it's considered under a but-for causation standard, which means she would need to show that Mr. Redd's animus torts or retaliatory animus torts was a but-for factor, not just simply a motivating factor in the termination. And the chain's broken so many times. It's broken because Mr. Quick actually made an independent assessment by observing her operate the forklift. She made an independent decision on her own to refuse to take the drug test, and then the decision was made by the Human Resources Department. When they got the information that she had refused to take the drug test, they applied their regular policy and they terminated her. Mr. Redd had no influence on any of these other than the fact that he initiated the trigger, so to speak, when he informed Mr. Quick that someone had told him that she was under the influence of drugs, which in fact was true in the long run because she admitted that she was under the influence of drugs at work operating the forklift. What kind of drug is that she was with? She admitted to taking Vicodin, which is a pain killer, which I believe, although this is not on the record, could impair someone's ability to operate a heavy machine. But it's not on the record. That's all I have unless you have any more questions, Your Honor. Thank you. Thank you, Mr. Bacon. Mr. Castelli, you have some time for a vote. Thank you, Your Honor. When Ms. Higgins was in the room meeting and discussing the possibility of the drug test, the person she was there speaking to was her own normal supervisor, Benue Thomas, with whom she'd had no previous problems, no previous discipline. He knew about the time off that she had been on due to some minor surgery and the fact that she had to take the Vicodin for that. And she also mentioned that she would do the drug test for Benue Thomas. But what came up was Mr. Quick telling her, and he admits that he told her, go to the clinic tomorrow morning, 8 o'clock. No one ever told her that that was a problem, that she needed to do it right then or lose her job. She did not go to the clinic, though? She went, like he said, at 8 o'clock the next morning. She went to his office. Is there a clinic separated from his office? It's referred some to the safety building, but it's also sort of a clinic in there, and that's where she understood. It's referred to as a clinic. It has been referred to that way. Right. And so at that point, she understood that it was all going to be taken care of the next day. The policy does say you can be terminated for refusing. It doesn't say that you're going to be terminated if you make arrangements to take it the next morning. And she thought she was doing exactly what the safety man told her. But when she went— Are you saying that there's no evidence or indication from her of refusal on the day of the forklift incident? She said she didn't want to take it as long as Mr. Redd and Mr. Quick were involved, the ones she felt like were conspiring against her. She did say that she didn't have a problem with Mr. Thomas and she would do it for him, but that wasn't the situation going on at the time, and that is why Mr. Quick suggested, presumably, the next morning. There was nothing in the company policy, was there, that gives an employee the right to say, I refuse to take a drug test unless X, Y, and Z are involved? No, there's nothing specific to that point other than to say there's nothing to say when exactly you must take it or under what circumstances either. However, in this case, since we have what to her was a pending sexual harassment claim against Mr. Redd she was not comfortable undertaking it as long as he was involved in the circumstances. Doesn't common sense tell us—I don't know whether there's anything in the record you can say if there is— but doesn't common sense tell us that drug tests need to be taken immediately because the condition of the blood or the urine or whatever it is would change if the tests were taken a day or several days later? Certainly there's nothing in the record, I do understand, since apparently the allegation made against her was marijuana. It's my understanding with no particular knowledge that that can be 30 days, 60 days. I don't think 8 a.m. the next morning was likely to cause any significant problem with regard to testing for that. Do you concede or agree—I don't know that it's a concession— that the analysis appropriate to her discharge is as a retaliatory discharge? That's what she's alleging, as I understand it, that she was discharged in retaliation for her having complained about Mr. Redd. I do think they actually play out as alternative theories. There is a quid pro quo sexual harassment action, and the tangible employment action that actually happened was ultimately her termination. Alternatively, I do contend that because she made the report to Mr. Duford, he didn't do anything, and then this occasion that we contend was set up by Mr. Redd further down the line played out, that it was also retaliation, but I do think that both of those theories do apply to her termination.